OPINION OF THE COURT
 

 Smith, J.
 

 The primary issue here is whether the State Human Rights Law (Executive Law § 296 [2] [a]) was violated when a medical facility used heightened precautionary measures while treating a patient perceived to be at risk for carrying the AIDS virus. Because the Appellate Division correctly determined that the procedures employed by respondent were supported by sound medical judgment and prevailing medical consensus at that time, we affirm.
 

 In 1985, respondent North Shore University Hospital had an infectious disease protocol in effect at its dental clinic. In an effort to minimize the risk of infection to the patient, the staff and other patients, the treatment of particular patient populations was governed by respondent’s infectious disease protocol. These precautions were defined within respondent’s "strict isolation techniques.” Covered by these infection control measures were persons testing positive for the AIDS virus, hepatitis B, intravenous drug abusers, patients who had received multiple blood transfusions, hemodialysis patients, persons suffering from mononucleosis or tuberculosis, homosexual men and prostitutes.
 

 Although the quality of the dental treatment given to patients covered by the infection protocol was no different from that given other patients, in accordance with the clinic’s strict isolation techniques, special precautions were taken in the rendering of treatment to patients in the populations covered by the infectious disease protocol. Included in these precautions was the marking of the examination room with a small letter "x,” draping the contents of the room with plastic to reduce the risk of contamination from the splatter of saliva or blood, and outfitting physicians and staff with masks, additional gloves, protective eyewear such as goggles instead of regular eyewear, caps and full-body garments such as disposable gowns or scrub suits.
 

 In 1985, the knowledge of medical professionals regarding the contraction and transmission of AIDS was by all accounts limited. Indeed, the first cases of AIDS were not reported in the United States until 1981
 
 (see,
 
 Surgeon General’s Rep on
 
 *417
 
 AIDS, US Dept of Health and Human Services [1987];
 
 see also,
 
 Preventing the Transmission of Hepatitis B, AIDS, and Herpes in Dentistry, US Dept of Health and Human Services [1985]). Further, in the early to mid 1980s, the perception was that simply being a member of specific groups or classes was a tell-tale sign that an individual was at a greater risk of contracting and transmitting the disease
 
 (id.,
 
 at 4). Subsequent research, however, revealed that life-style and behavior patterns played a substantial role in an individual’s contracting the AIDS disease
 
 (see,
 
 Surgeon General’s Rep on AIDS,
 
 op. cit.,
 
 at 680).
 

 Authorities in the medical community responded by recommending guidelines to prevent the spread of the AIDS virus
 
 (see, Infection Control in the Dental Office,
 
 97 J of Am Dental Assn 673 [Oct. 1978]). Although the American Dental Association issued guidelines regarding infection control recommending universal precautions as early as 1977, the widespread AIDS epidemic did not occur until the early 1980s (Surgeon General’s Rep on AIDS,
 
 op. cit.).
 
 There was no evidence that these guidelines were used to prepare North Shore’s protocol, which was prepared some time around 1983. However, there was evidence that sources from the American Dental Association, Council on Dental Therapeutics of the American Dental Association and the Centers for Disease Control were used in the preparation of North Shore’s protocol. Further, the Centers for Disease Control (CDC) did not issue its "Recommended Infection Control Practices for Dentistry” until April 1986. Prior to the release of the CDC recommendations, health care workers and institutions employed procedures designed to limit the transmission of AIDS as well as balance the protection of patients with the protection of staff similar to procedures used to treat patients with other infectious diseases.
 

 On three occasions in 1985, the complainant, David Martell, visited respondent hospital’s dental clinic. On October 30, 1985, Martell sought emergency dental treatment for a root canal problem from respondent hospital and was treated by a member of respondent’s staff without incident. A follow-up appointment was scheduled for November 15, 1985. Some time between Martell’s first appointment and his follow-up appointment, his treating physician at respondent hospital developed the belief that Martell was a homosexual and consequently might be at a higher risk for AIDS. At his follow-up appointment on November 15, 1985, Martell was questioned about his sexual orientation, any history of intravenous drug use and
 
 *418
 
 other subjects, to determine his level of risk of infection with HIV (the AIDS virus), related viruses or contagious diseases. The complainant became upset as a result of the doctor’s questions and left the clinic without receiving treatment. On November 22, 1985, however, Martell returned for a third visit, and was treated in accordance with the clinic’s "strict isolation technique” under its infectious disease protocol. The physicians treating Martell wore masks, two sets of gloves, goggles, full-body disposable gowns, and caps. Additionally, sheets of plastic covered some of the equipment in the room in which Martell received treatment and a small "x” was taped over the door of the treating room.
 

 On December 6, 1985, complainant Martell filed a complaint with the New York State Division of Human Rights (DHR), alleging that because he was perceived as being a member of a high-risk group, he had been denied equal privileges at a public accommodation on the basis of a perceived disability in violation of the Human Rights Law (Executive Law § 296 [2] [a]). The matter was referred for a hearing after a determination was made by DHR that probable cause existed. A hearing was conducted before an Administrative Law Judge (ALJ) at which it was determined that respondent unlawfully discriminated against complainant because of his perceived disability, that the "isolation treatment” caused complainant unnecessary embarrassment and humiliation, and that the hospital’s infectious disease protocol constituted an illegal discriminatory practice.
 

 The Commissioner of DHR determined that the complainant had been subjected to illegal discrimination and had suffered mental anguish as a result. Adopting a number of the ALJ’s proposed findings, the Commissioner ordered respondent hospital to "cease and desist” discriminating because of actual or perceived disability, compensate complainant in the amount of $25,000, cease using a dental protocol dictating different treatment depending on the patient’s "race, color, national origin, marital status, sex or perceived disability,” establish a program providing education to its staff on the transmission of AIDS/HIV, and incorporate universal infection control guidelines for all patients.
 

 In a CPLR article 78 proceeding, respondent hospital sought judicial review pursuant to Executive Law § 298, and, in accordance with the provisions of CPLR 7804 (g) and 7803 (4), the matter was transferred from Supreme Court to the Appellate Division.
 

 
 *419
 
 The Appellate Division annulled the determination and dismissed the complaint. Citing Executive Law § 296 (2) (a) and
 
 Elaine W. v Joint Diseases N Gen. Hosp.
 
 (81 NY2d 211), the Appellate Division found that the complainant was provided the dental treatment he required and was not denied any accommodations, advantages, facilities or privileges. The Court held that respondent hospital’s protocol, as part of a bona fide effort to protect both patients and staff, was reasonable, based on prevailing medical consensus at the time.
 

 Appellant, DHR, argues that based on the perception that Martell was infected with HIV, respondent discriminated against complainant by providing disparate treatment. Complainant maintains that he was neither HIV positive nor homosexual. Complainant argues further that respondent’s treatment was humiliating and its defense of medical justification entitled to no deference, as such defense was merely a pretext for discrimination. Respondent argues that the procedures used were supported by sound medical judgment and consistent with the state of medical knowledge on AIDS as of 1985.
 

 The standard for review of administrative action is whether there was substantial evidence to support the finding, in this case, that respondent hospital discriminated against complainant by its disparate treatment. We hold that the administrative agency’s finding of improper discriminatory treatment was not supported by substantial evidence.
 

 Here the burden was on the complainant to establish a prima facie case of discrimination. Complainant alleges that respondent’s treatment of him was discriminatory. Specifically, complainant complains of treatment in an isolated room located at the end of a dark hallway, with all of the equipment draped in plastic, a small "x” on the door and the treating physician and staff outfitted in protective clothing. Upon this showing the burden shifted to North Shore to rebut the presumption of discrimination by putting forth legitimate, nondiscriminatory reasons for the difference in treatment. North Shore did this by showing that at the relevant time, its protocol was reasonable, medically warranted and consistent with its desire to protect patients and staff from the spread of infectious diseases
 
 (see, Elaine W. v Joint Diseases N. Gen. Hosp.,
 
 81 NY2d, at 217,
 
 supra).
 
 Once the presumption of discrimination had been rebutted, the complainant had to establish that the reasons proffered " 'were not [the] true
 
 *420
 
 reasons, but were a pretext for discrimination.’ ”
 
 (See, Matter of Miller Brewing Co. v State Div. of Human Rights,
 
 66 NY2d 937, 939, citing
 
 McDonnell Douglas Corp. v Green,
 
 411 US 792; and
 
 Texas Dept. of Community Affairs v Burdine,
 
 450 US 248;
 
 Matter of Maloff v City Commn. on Human Rights,
 
 46 NY2d 908;
 
 St. Mary’s Honor Ctr. v Hicks,
 
 509 US 502.)
 

 As to whether a legitimate, nondiscriminatory reason for the difference in treatment has been proffered or merely a pretext for discrimination, respondent hospital established that its decision to treat complainant under its disease protocol was based on prevailing medical knowledge. The perception of the medical professionals that complainant may have presented a greater risk to hospital staff and other patients of infection with a contagious disease, in this case AIDS, supported respondent’s decision to treat Martell with additional infection control precautions. The evidence shows that infection control practices similar to respondent’s were widespread in dental offices in the early 1980s. Clearly, respondent’s disease protocol was consistent with accepted medical practice in 1985 for treatment of patients known or perceived to be at high risk of infection of the then recently discovered, contagious and fatal disease and not a pretext for discrimination. Contrary to the Commissioner’s conclusion, respondent was not limited to the minimum precautions necessary but could take additional precautions which were warranted based on prevailing medical perceptions at the time.
 

 Accordingly, the judgment of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Simons, Titone, Bellacosa, Levine and Ciparick concur.
 

 Judgment affirmed, with costs.