Marc **GREENBERG**, Plaintiff,

v.

**NEW YORK CITY TRANSIT AUTHORITY**, Defendant.

Civil Action No. CV–99–3666 DGT CLP.

United States District Court,
E.D. New York.

Sept. 27, 2004.

Marc Greenberg, Belle Harbor, NY, pro se.

James Reif, Margaret Ann Malloy, Gladstein, Reif & Meginniss, LLP, New York, NY, for Plaintiff.

Joyce Rachel Ellman, Michele Leigh Sheridan, Richard Schoolman, Sundria R. Lake, Brooklyn, NY, for Defendant.

### MEMORANDUM & ORDER

TRAGER, District Judge.

In this action, plaintiff Marc Greenberg ("Greenberg," "plaintiff") claims (i) that his termination as an employee of the New York City Transit Authority ("TA," "Transit Authority," "defendant") in August 1994 violated Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12111–12117 ("ADA"), because the TA intended to discriminate against him because he was either actually disabled or was perceived to be disabled, and (ii) that his reinstatement by the TA in June 1997 was delayed, in violation of the ADA, because the TA wished to retaliate against him for his having asserted ADA-related rights by filing an Equal Employment Opportunity Commission ("EEOC") charge following his termination. (Second Amended Complaint ("Am.Compl.") ¶ 1). Plaintiff also brought supplemental claims under the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8–101 *et seq.* ("NYCHRL"). (Am.Compl.¶ 1).

The TA has moved for summary judgment in its favor, and also to dismiss the action for allegedly false material statements made by plaintiff during his deposition. Specifically, as to the first part of its motion, defendant argues that summary judgment in its favor is appropriate because "the undisputed material facts do not show that the employment of the plaintiff, Marc Greeneberg, was terminated ... in mid–1994 because he was, or was perceived as being disabled, within the meaning of the ADA; nor do the facts show that his reinstatement (in June 1997) was delayed by any ADA-retaliatory motive, or for any other reason proscribed by the ADA" (Def. Mem. of Law in Support 8). As to the second part of its motion, defendant argues that this action should be dismissed "because the plaintiff lied in his deposition about what is effectively [his] sole remaining claim in this action, that is, his emotional distress claim arising from his termination" (Notice of Defendant's Motion to Dismiss; Def. Mem. of Law in Support 9).

Plaintiff has cross-moved for partial summary judgment in his favor on the following matters: (1) defendant "discharged [p]laintiff from his employment in 1994 because it regarded him as disabled within the meaning of the [ADA]"; (2) "[d]efendant discharged [p]laintiff from his employment in 1994 because he was disabled within the meaning of the [NYSHRL] and the [NYCHRL]"; and (3) "[d]efendant had no valid reason to terminate [p]laintiff's employment." (Notice of Plaintiff's Motion for Partial Summary Judgment; Pl. Mem. of Law in Support 1).

Prior to filing this action in federal court, plaintiff initiated several proceedings in response to his termination. Following is a brief overview of those proceedings. On August 31, 1994, plaintiff filed a grievance contesting his discharge (Greenberg Decl. Ex. F). The TA denied plaintiff's grievance and his appeal (*id.*).

Plaintiff filed a charge of disability discrimination with the EEOC in September 1994, complaining of his termination by the TA in August 1994 (Greenberg Decl. ¶ 50). The EEOC eventually issued a right-to-sue letter and plaintiff commenced this action, *pro se*, on June 28, 1999. Subsequently, plaintiff obtained counsel and filed an Amended Complaint and a Second Amended Complaint. Discovery as to liability has been completed.

In a separate action, on February 13, 1995, plaintiff filed a charge of discrimination with the New York State Workers' Compensation Board ("WCB") (Greenberg Decl. ¶ 50). After several hearings, a Workers' Compensation Law ("WCL") Judge in December 1995 determined that in discharging plaintiff in 1994, the TA had discriminated against him in violation of the Workers' Compensation Law and ordered the TA to reinstate him, subject to a satisfactory medical examination (Malloy Decl. Ex. V. at 30). The TA did not comply with that order, but instead, on January 3, 1996, submitted an application for WCB review of the decision (Malloy Decl. Ex. W). On February 3, 1997, a WCL Judge again ordered the TA to reinstate plaintiff to employment (Malloy Decl. Ex. X at 2). The TA did not comply with the order, but instead, on March 25, 1997, submitted an application for WCB review of the decision. In addition, the TA submitted an application for full WCB review on December 30, 1997 and June 17, 1998 (Malloy Decl. ¶ 4, Ex. W). The WCB issued a decision, which was subsequently amended two times, finding that the TA discriminated against plaintiff, including a finding that the TA "did not have a valid reason for terminating [plaintiff] on August 22, 1994" (Malloy Decl. Ex. W (May 17, 2001 Decision) at 3). The WCB rejected as a pretext the TA's assertion that it

discharged Plaintiff pursuant to Civil Service Law § 71 (id.).

The TA filed three notices of appeal with the New York State Supreme Court Appellate Division, Third Department, but failed to prosecute all three (Malloy Decl. ¶ 4). Pursuant to section 22 N.Y.C.R.R. § 800.12, all three of those appeals were deemed abandoned. On September 11, 2002, the Third Department dismissed the TA's third abandoned appeal, and the litigation of the TA's liability under the WCL has been concluded (Malloy Decl. ¶ 4 and Ex. W (3rd Dep't Sept. 11, 2002 Decision and Order on Motion)).

Plaintiff received back pay by order of a WCB proceeding for the period from August 26, 1994 to June 9, 1997 (Schoolman Decl. ¶ 13; Defendant's Local Rule 56.1 Statement ("Def. Rule 56.1 Statement") ¶ 28; Plaintiff's Rule 56.1 Statement in Opposition to Defendant's Motion to Dismiss ("Pl. Rule 56.1 Opp.") ¶ 28).

### Background

Plaintiff was hired by the TA in June 1978, and within a year became a Bus Maintainer, Group B (a civil service title) (Declaration of Marc Greenberg, Sept. 24, 2003 ("Greenberg Decl.") ¶ 2; Defendant's Memorandum of Law in Support of its Motion to Dismiss ("Def.Mem.") at 2). In September 1987, plaintiff suffered an on-the-job injury to his left knee (Declaration of Richard Schoolman ("Schoolman Decl."), Ex. E; Greenberg Decl. ¶ 6).

Plaintiff's orthopedist, Dr. Bennet Futterman, in a report dated March 15, 1988, reported to the TA that plaintiff suffered from a tear of the left medial meniscus and requested authorization to perform arthro-scopic surgery of the left knee (Plaintiff's Rule 56.1 Statement in Support of Plaintiff's Motion for Partial Summary Judgment ("Pl. Rule 56.1 Statement") ¶ 4). Arthroscopic surgery was eventually performed on the left knee on August 18, 1988 (Malloy Decl. Ex. C at P58, P64).

On April 12, 1988, the TA Medical Assessment Center ("MAC") concluded that plaintiff was able to perform "no work," which meant that plaintiff was considered unable to perform any work for the TA (id. ¶ 5). Plaintiff continued in a "no work" status until December 28, 1988, when the MAC determined that plaintiff could perform restricted work (id. ¶ 6). The restrictions that the TA imposed on plaintiff on December 28, 1988 included "limited use of left leg" and "limited bending, crawling, crouching, kneeling, stooping" (id. ¶ 6; Malloy Decl. Ex. C at P81).

Plaintiff states that he was not permitted to return to work until June 1, 1989, at which time he returned to "restricted" work as a bus maintainer in a bench job working on small parts (Pl. Rule 56.1 Statement ¶ 8). Defendant explains that there was no work available for plaintiff until June 1, 1989 (Defendant's Counter Local Rule 56.1 Statement in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Def. Counter Local Rule 56.1 Statement") ¶ 2). The record shows that on December 30, 1988, plaintiff was placed in the "No Work Available" category by the TA's Surface Department (Schoolman Decl. Ex. F).

In April 1989, before returning to work, plaintiff submitted an application for disability retirement, which was denied (Greenberg Decl. ¶ 16).[1]

---

1. Although plaintiff claims that "the TA instituted disability retirement proceedings for [p]laintiff, which it does if it if it [sic] believes that an employee 'has no work permanent,' or that 'there is no possibility that they would ever be able to return to work'" (Pl. Rule 56.1 Statement ¶ 9), defendant alleges that "Mr. Greenberg himself applied for disability retirement" (Defendant's Counter Local Rule 56.1 Statement ¶ 3). Based on the deposition of Dennis Monsen, who was the Senior Director of Labor Relations and Budget for the Transit Policy Special Services Bureau at the

On November 30, 1989, it was determined by a physician at the TA Medical Services Department that plaintiff could "remain at bench job. No bending or crouching until reevaluated" (Malloy Decl. Ex. C at P131–32, P124B). In February 1990, a TA doctor deemed plaintiff's continuing medical restrictions "permanent" (Greenberg Decl. ¶ 17; Malloy Decl. Ex. C at P131–32).[2]

In June 1990, plaintiff was examined by the MAC, and he was told that he was eligible for reclassification to work as a Transit Property Protection Agent ("TPPA")[3] or Railroad Clerk (Pl. Rule 56.1 Statement ¶ 12; Def. Counter Local Rule 56.1 Statement ¶ 6; Greenberg Decl. ¶ 18; Malloy Decl. Ex. G). Plaintiff was reclassified and began work as a TPPA on August 13, 1990 (Pl. Rule 56.1 Statement ¶ 12; Greenberg Decl. ¶ 18).

Between 1989 and 1994, as indicated in Dr. Futterman's regular reports to the TA and in records of the MAC, plaintiff's medical problems expanded to include his right knee, back, and neck (Pl. Rule 56.1 Statement ¶ 15; Def. Counter Local Rule 56.1 Statement ¶ 7). Dr. Futterman submitted requests for the TA to authorize physical therapy for both plaintiff's knees and for surgery to his right knee and back (Pl. Rule 56.1 Statement ¶ 16).[4] Physiotherapy and right knee surgery were authorized by decisions of Workers' Compensation Law Judges (id.). Despite these ongoing medical problems, plaintiff continued to work for the TA without taking any additional work-related disability leaves from employment (Pl. Rule 56.1 Statement ¶ 17).

Plaintiff worked as a TPPA until July 11, 1994, when he claims his right knee gave out while he was working (Greenberg Decl. ¶ 24; Pl. Rule 56.1 Statement ¶ 18; Def. Counter Local Rule 56.1 Statement ¶ 9). That day, plaintiff was treated at St. Luke's Roosevelt Hospital, where he was instructed, among other things, to use a cane (Pl. Rule 56.1 Statement ¶ 19). In the accident report, which was also signed by plaintiff, plaintiff's supervisor noted that the accident was a "recurrence of old job-related knee injury" and that plaintiff's doctor had previously recommended surgery "to relieve problem in knee area" (Pl. Rule 56.1 Statement ¶ 20; Def. Counter Local Rule 56.1 Statement ¶ 10). The MAC concluded on July 12, 1994 that plaintiff could not perform any work for the TA for at least two weeks (Pl. Rule 56.1 Statement ¶ 21).

On July 28, plaintiff was examined by the TA's medical consultant, Dr. Swearin-

time plaintiff was terminated, in a typical situation, "if the medical services or Occupational Health Services determines that someone has no work permanent, which would mean there is no possibility that they would ever be able to return to work, then they would give them forms and recommend that they explore the possibilities of applying for an ordinary disability retirement or something along those lines." (Malloy Decl. Ex. R (Excerpts from the Deposition of Dennis Monsen) ("Monsen dep.") at 21:15–16, 83:15–22). Thus, it appears that plaintiff was given the forms by someone at the TA, and he then applied for disability retirement.

2. Defendant contends that "permanent means expected to last for several months or into the near future" (Def. Counter Local Rule 56.1 Statement ¶ 4). This interpretation is not supported by the NYCTA Medical Services Department Progress Report cited by defendant, which states that "Injuries are beyond 2 years old. Will give permanent restriction at this time ... No return to FD seen in near" (Malloy Decl. Ex. C at P132).

3. A TPPA performs a variety of security-related functions (Schoolman Decl. ¶ 10).

4. Plaintiff did not actually undergo surgery for his right knee until December 1994 (Def. Local Rule 56.1 Statement ¶ 17; Schoolman Decl. Ex. L at 2–3.)

gen, who recommended that he undergo an MRI of his right knee (Malloy Decl. Ex. C at P223–27; Pl. Rule 56.1 Statement ¶ 34; Def. Counter Local Rule 56.1 Statement ¶ 20). Dr. Swearingen, in his report for the July 28 visit, noted that Greenberg "can work but can not be placed in position where he could be injured by a fall such as from high places." (Malloy Decl., Ex. C at P226). Plaintiff underwent an MRI on August 3, 1994. The MRI report that was sent to the TA stated that plaintiff had a "complex tear" to his "entire right medial meniscus with associated chondromalacia of articular cartilage in medial compartment" (Pl. Rule 56.1 Statement ¶ 35).

Sometime between July 11 and July 21, 1994, Jill Johnsen, the Assistant Director of Workers' Compensation at the TA, met or spoke with Michael Thompson, plaintiff's supervisor from the property protection department, and Ms. Johnsen advised Thompson that his department should terminate plaintiff.[5] (Def. Local Rule 56.1 Statement ¶ 11; Johnsen Decl. ¶ 4 and Ex. B at 75). Thompson was directed to have his department send a letter to plaintiff indicating the Transit Authority's intent to terminate plaintiff's employment, and thereafter, his department was directed to send a termination letter (Def. Local Rule 56.1 Statement ¶ 12; Johnsen Decl. ¶ 4 and Ex. B at 75; Malloy Decl. Ex. H at 29:10–14, 34:10–15; Malloy Decl. Ex.E at 52:13–13). Thompson was informed that plaintiff "wasn't able to perform his job, was unable to come to work and perform his duties" (Malloy Decl. Ex. H at 29–30).

On July 25, 1994, plaintiff received a letter from TA Director of Labor Relations, Dennis Monsen, dated July 21, 1994, entitled "Intent to Terminate, Section 71, Tier 4, 30 Day Notice" (Greenberg Decl. ¶ 27), stating that:

The Transit Authority's records indicate that you have been unable to perform the duties of your title due to a disability resulting from a service connected (injury/illness) since 9/10/87.

You are hereby notifird [sic] that, pursuant to section 71 of the Civil Service Law, the Transit Authority intends to terminate your employment effective 8/21/94. You should be aware that as a tier 4 employee you may be eligible for disability or service retirement benefits which may be affected by the termination.

(Malloy Decl. Ex. J.; Pl. Rule 56.1 Statement ¶ 27)

On July 26, 1994, the MAC determined that plaintiff could work, but was restricted to "Bench/Sedentary work" and was to: avoid heights and ladder climbing, not operate any TA vehicle, stay off structures and tracks, not stand or walk more than four hours in an eight-hour period, and perform only limited bending, crawling, crouching, or kneeling. A revisit to the MAC was scheduled for August 26. (Pl. Rule 56.1 Statement ¶ 28.)

---

**5.** Plaintiff alleges that there was a meeting held, which was attended by Michael Thompson and Jill Johnsen, in which plaintiff's termination was discussed (Pl. Rule 56.1 Statement ¶¶ 22–26). Defendant admits that Thompson and Johnsen discussed plaintiff's termination but does not admit that said discussion took place at an actual meeting (Def. Counter Local Rule 56.1 Statement ¶¶ 11–15). Since the operative fact is the communication between Thompson and Johnsen, whether or not a meeting was actually held is irrelevant for purposes of this action. Furthermore, plaintiff's allegation that "all documents relating to [said] meetings, including agendas, minutes and notes, have been destroyed" (*id.* ¶ 26) has no basis given that there is no actual evidence a meeting was held and that, as noted by plaintiff, such documents are "routinely kept for a year and then destroyed" (*id.*).

Plaintiff claims that he attempted to return to work on July 26, but was told there was no restricted duty position available for him (Greenberg Decl. ¶ 29).[6] Sometime in July, plaintiff also contacted the TA Workers' Compensation unit to request that he be reclassified as a token booth clerk—a job he hoped he could do while on restricted duty. Plaintiff was told that the TA would not allow him to be reclassified, but that instead, his employment would be terminated (Pl. Rule 56.1 Statement ¶ 33; Greenberg Decl. ¶ 32).[7]

Although plaintiff had received the July 25th letter, notifying him that his employment would be terminated effective August 21, 1994, plaintiff claims that on Monday August 22, he called his department prior to his shift to clear himself for work, but was told that he could not report for work until he had the proper medical clearance from his doctor, the TA's medical consultant, and the MAC (Greenberg Decl. ¶ 34).[8] Plaintiff claims that he subsequently spoke to managers in the TA's restricted duty and Workers' Compensation units who informed him that he would not be permitted to return to work unless he could work full duty (id. ¶ 35).[9]

Plaintiff was examined by his doctor, Dr. Rodriguez, on August 23, 1994, who wrote a note clearing him to return to his regular work on August 24 (Pl. Rule 56.1 Statement ¶ 40; Malloy Decl. Ex. C at P238). Plaintiff again attempted to report for work, bringing the note from his doctor, but was not permitted to do so (Pl. Rule 56.1 Statement ¶ 41).

Plaintiff was examined by the TA's medical consultant, Dr. Swearingen, on August 24. (Pl. Rule 56.1 Statement ¶ 43). In a report to the TA dated August 29, 1994, Dr. Swearingen noted that "claimant has been terminated as of 8/22/94." In that report, Swearingen explained that he reviewed the August 3 MRI and concluded that although "claimant has a note from his physician saying he may return to full duty without treatment[,] I can not counsel you that to send this man back to work with a complex tear of the medial meniscus will not cause him further damage to that [right] knee. Consequently my recommendation must be that arthroscopic surgery be done and the knee situation cleared as well as possible." (Malloy Decl. Ex. C at P239–44).

On August 24, plaintiff sent two letters and his doctor's note to Dennis Monsen at the TA by overnight mail, return receipt request. The documents were delivered on August 25. (Pl. Rule 56.1 Statement ¶ 42.)

On August 24, 1994, the TA sent plaintiff a letter dated August 22, 1994 informing him that his employment had been terminated (Greenberg Decl. Ex. B). Plaintiff received the letter on or about August 26 (Greenberg Decl. ¶ 43). The letter stated that

Pursuant to Civil Service Law, section 71, you may within one year after the termination of your medical disability, make application to the City Personnel Director for a medical examination for the purpose of determining whether you

6. Defendant neither admits nor denies this claim, since plaintiff does not state with whom he spoke (Def. Counter Local Rule 56.1 Statement ¶ 17).

7. Defendant neither admits nor denies this claim, since plaintiff does not state with whom he spoke (Def. Counter Local Rule 56.1 Statement ¶ 19).

8. Defendant neither admits nor denies this claim, since plaintiff does not state with whom he spoke (Def. Counter Local Rule 56.1 Statement ¶ 22).

9. Defendant neither admits nor denies this claim, since plaintiff does not state with whom he spoke (Def. Counter Local Rule 56.1 Statement ¶ 23).

are mentally and physically fit to perform the duties of your position. If you are found fit, you will be reinstated to your former lower grade in the same occupational field or a vacancy for which you are eligible for transfer. If no appropriate vacancies exits [sic], or if the workload does not warrant filling the vacancy, your name will be placed on a preferred list for your former position and you will be eligible for reinstatement from such preferred list for a period of four years. If you are reinstated to a position in a lower grade, then your name will be placed on the required eligible list for your former former [sic] or any similar position.

(Greenberg Decl. Ex. B.)

On August 29, Monsen sent plaintiff a letter dated August 26, 1994, responding to plaintiff's letters and referring him to the August 22, 1994 letter informing plaintiff of his termination (Greenberg Decl. Ex. C). Plaintiff received the letter on or about September 1, 1994 (Greenberg Decl. ¶ 45).

As directed by Monsen, on August 29, 1994, plaintiff wrote to the New York City Department of Personnel to apply for reinstatement and enclosed a copy of Dr. Rodriguez's August 23 note (Greenberg Decl. ¶ 47 and Ex. D). In response, Phil Bibla, Department Advocate from the Department of Personnel, responded in a letter dated September 12, 1994 that plaintiff was required to submit medical documentation showing that his disability was "in fact terminated" and that he must "wait a reasonable period of time in order to insure that your disability is terminated before making another application for a medical examination." (Greenberg Decl. Ex. E.) Plaintiff was, therefore, not to reapply until after December 12, 1994. (*Id.*) The letter was copied to the TA. (*Id.*)

Following referral for a psychological evaluation by the Workman's Compensa-

tion Board at the request of Dr. Futterman (Malloy Decl. Ex. N (Psychological Evaluation by Allison Margolies)), on November 8, 1994, plaintiff saw a psychologist, who reported to the TA that plaintiff "should be given some type of work (collecting tolls, office work, train new employees, driver, etc.) which would not interfere with his injuries with a physician's approval for him to work." (*Id.* (Attending Psychologist's Report)).

In December 1994, plaintiff underwent surgery on his right knee, performed by a partner of Dr. Futterman's, and Dr. Futterman considered him able to return to full duty as a TPPA as of January 23, 1995. (Def. Local Rule 56.1 Statement ¶ 17; Schoolman Decl. Ex. L at 2–3.)

On January 23, 1995, plaintiff wrote to Bibla requesting reinstatement to his position at the TA (Greenberg Decl. Ex. I). By letter dated February 8, 1995, Bibla informed plaintiff that he was scheduled for a medical examination on March 1, 1995 with Dr. Hubert Pearlman (Greenberg Decl. Ex. J). The letter was copied to the TA (*id.*). By letter of March 2, 1995, Dr. Pearlman informed Bibla that plaintiff could return to his "usual occupation with no restrictions" (Malloy Decl. Ex. O).

On March 17, 1995, Lilliam Barrios–Paoli, the City Personnel Director/Commissioner wrote to plaintiff informing him of the doctor's findings and stating that plaintiff was entitled to reinstatement to his former position, a similar position, a position in a lower grade, or to a position for which he was eligible for transfer (Greenberg Decl. Ex. P). The letter instructed plaintiff to contact the TA's director of employment, Earnest Mack, to arrange his reinstatement (*id.*). The City Personnel Director also wrote to Alan Kiepper, President of the TA, informing him of the same (Malloy Decl. Ex. P). In that letter, the

City Personnel Director stated that plaintiff was "medically examined pursuant to Section 71 of the New York Civil Service Law," and that "[h]e has been certified by a City appointed physician as medically fit to perform the duties of his position as a [TPPA]." (*Id.*) The letter then quoted Section 71 of the Civil Service Law. (*Id.*) By letter dated April 20, 1995, Alan Kiepper replied to the Personnel Director that plaintiff "had been canvassed to report for pre-employment processing, including the filing of formal reinstatement papers with the Control and Service Division of the Department of Personnel" (Malloy Decl. Ex. Q).

After receiving the March 17 letter, plaintiff called Mack to request that he be reinstated but was informed that his former title was over budget and that he should try back in a year (Greenberg Decl.) (Greenberg Decl. ¶ 57). Plaintiff claims that in May of 1995, he filled out a complete TA job application (Greenberg Decl. ¶ 58).[10] Defendant never responded to the May 1995 employment application (Greenberg Decl. ¶ 58–59).

On March 10, 1995, the Department of Personnel issued a certificate to the TA authorizing plaintiff's reinstatement to his former position, effective May 15, 1995 (Malloy Decl. Ex. T). On May 26, 1995, however, the TA Assistant Vice President of Employment wrote to the Department of Personnel stating that there were no current vacancies in the TPPA title and requested that plaintiff's name be placed on a preferred list for future vacancies (Malloy Decl Ex. U).

After submitting a complete employment application, plaintiff was reinstated to the position of TPPA on June 9, 1997 (Greenberg Decl. ¶ 60).

---

**10.** Defendant has no evidence of such an application. (Def. Counter 56.1 Statement ¶ 36.)

## Discussion

### (1)

The ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring, advancement, or discharge of employees ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Courts reviewing discrimination claims under the ADA apply the burden-shifting framework established for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir.2002) (applying *McDonnell Douglas* burden-shifting framework to analyze a claim of intentional discrimination under the ADA). First, the plaintiff must demonstrate a *prima facie* case of discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the plaintiff meets its burden of establishing a *prima facie* case, the burden then shifts to the defendant to articulate evidence that the adverse employment action was taken for a legitimate, non-discriminatory reason. *See id.* at 506–07, 113 S.Ct. 2742; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant successfully does so, the burden of persuasion then shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

(2)

The first question that must be addressed is whether plaintiff demonstrates a *prima facie* case of discrimination. To establish a *prima facie* case of discrimination under the ADA, the plaintiff must show that: (1) the defendant employer is subject to the ADA; (2) the plaintiff suffers from a qualifying disability within the meaning of the ADA; (3) the plaintiff could perform the essential functions of the job with or without reasonable accommodation; and (4) the plaintiff was suspended because of his disability. *See Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869–70 (2d Cir.1998); *see also Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir.2002). If the employee can establish that he could perform the essential functions of the job with reasonable accommodation and that the employer refused to make such accommodation, employer's failure to make a reasonable accommodation amounts to discharge "because of" his disability. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir.2000)

(citing *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir.1998)).

As to the first prong required for a *prima facie* claim, defendant does not contest that it is an employer subject to the ADA (Malloy Decl. Ex. A (Second Amended Complaint) ¶ 6; Malloy Decl. Ex. B (Answer to Second Amended Complaint) ¶ 6). As to the third prong, plaintiff asserts, without opposition by defendant, that "[t]here can be no dispute that [he] possessed the requisite skill, experience, education and other job-related requirements for the position of TPPA, having worked in that position for four years prior to his termination" (Pl. Mem. of Law in Support 13). In those four years, plaintiff was capable of working as a TPPA either in a restricted duty or sedentary position or with the use of a chair or stool.[11] Plaintiff therefore makes a *prima facie* that he was qualified to perform the essential functions of his TPPA job with reasonable accommodation.[12] (*Id.*) The third prong is satisfied. As to the fourth prong, requiring that plaintiff show that he was suspended because of his disability, plaintiff

---

**11.** At the time of plaintiff's termination, the duties of his TPPA position in fare evasion were to station himself near the turn-styles in a subway station and attempt to dissuade people from entering without paying their fare by requesting that they do so. The position involved no physical confrontation or use of force. (Pl. Rule 56.1 Statement ¶ 29.) There is disagreement among the parties as to whether the TPPA position could be performed sitting down, and whether there are TPPA positions that are sedentary. Plaintiff claims that he could have performed the duties of his position had he been permitted to use a stool or a chair to occasionally sit (Greenberg Decl. ¶ 31). In addition, plaintiff claims there are TPPA positions that are sedentary in which he could have worked (*id.*). In opposition to this assertion, defendant cites to the deposition of Dennis Monsen, which states that workers in the TPPA position "would have periods where they were able to sit because if they had had [sic] a booth where there is a seat and a desk in the booth, they

could sit and station themselves in the booth until they had to come out and unlock the gate or do a patrol or whatever reason they would have to get up. Very few locations would they sit for any length of time, though." (Malloy Decl. Ex. E at 128). This remains an outstanding question of material fact.

**12.** Plaintiff argues that on August 24, 1994, his doctor cleared him to resume the full duties of his TPPA position, and that he could have returned to full duty as a TPPA without a reasonable accommodation on August 24 following a brief six-week paid or unpaid leave of absence (Pl. Mem. of Law in Support 14). This aspect of plaintiff's argument is unpersuasive because plaintiff fails to establish that he could have worked as a TPPA without reasonable accommodation. However, since it is enough for plaintiff to show that he could perform the essential functions of the job with or without reasonable accommodation, the point is irrelevant.

points out that the TA itself informed him that he had been discharged because in its view he had been "unable to perform the duties of [his] title due to a disability resulting from a service connected (injury/illness) since 9/10/87" (Malloy Decl. Ex. J). The only prong that is in dispute is the second.

Under the second prong, plaintiff must show that he suffers from a qualifying disability within the meaning of the ADA. To demonstrate a disability under the ADA, a plaintiff must show: (1) a physical or mental impairment which substantially limits one or more major life activities; (2) a record of having such an impairment; or (3) that he is regarded as having such an impairment. *See Reg'l Econ. Cmty. Action Program, Inc.*, 294 F.3d at 46 (citing 42 U.S.C. § 12102(2)). "In the first category, an individual is considered disabled if he or she: (1) suffers from a physical or mental impairment, that (2) affects a major life activity, and (3) the effect is 'substantial.'" *Id.* (citing *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)). The ADA does not define "major life activities" or "substantial" limitation. However, the EEOC regulations promulgated under the ADA, while not binding, provide guidance in interpreting these terms. See *Ryan v. Grae & Rybicki*, 135 F.3d 867, 870 (2d Cir.1998) (citing *Francis v. City of Meriden*, 129 F.3d 281, 283 n. 1 (2d Cir.1997)). "Major life activities" are defined by the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *See id.* (citing 29 C.F.R. § 1630.2(i)).

In support of his ADA claim, plaintiff claims that the evidence shows he was actually disabled at the time of his termination (Pl. Mem. of Law in Opp. 10–15; Pl. Mem. of Law in Support 10–16). In the alternative, plaintiff contends that the evidence shows that defendant TA regarded him as disabled (Pl. Mem. of Law in Opp. 15–16; Pl. Mem. of Law in Support 11–13). Plaintiff argues that he was disabled within meaning of the ADA in several ways. First, plaintiff contends that he was actually disabled since he was substantially limited in the major life activities of bending, crawling, stooping, crouching, lifting, carrying, walking, and sitting. (Pl. Mem. of Law in Opp. 11.) Second, plaintiff contends that he was actually disabled since he was substantially limited in the major life activity of working (*id.* 11–15). Third, plaintiff contends that he was regarded by the TA as having a physical impairment which substantially limited the major life activity of working (*id.* 15–16). Since plaintiff has successfully established a *prima facie* claim that defendant regarded him as disabled within meaning of the ADA, it is unnecessary to determine whether plaintiff was actually disabled.

■ Plaintiff puts forth sufficient evidence to support a claim that defendant regarded him as having a physical impairment which substantially limited the major life activity of working. As of August 1, 1994, TA Workers' Compensation records indicated that plaintiff had been temporarily totally disabled from April 11, 1988 to June 1, 1989, from June 1, 1989 to July 12, 1994 and from July 12, 1994 to July 26, 1994 (Pl. Rule 56.1 Statement ¶ 36).[13] In deciding to discharge plaintiff in 1994, the TA relied on what it considered to be plaintiff's inability to work at the TA at the time and his inability to work in a broad range of jobs for over one year in 1988–1989. (Pl. Mem. of Law in Support 11). Furthermore, the fact that the TA reclassified him from a bus mechanic position to a

**13.** The TA considers an employee who is temporarily totally disabled as unable to do any work at the TA at that time (Malloy Decl. Ex. D at 58).

TPPA position indicates that the medical restrictions the TA placed on plaintiff were deemed by the TA to be long-term restrictions. (*Id.*) The evidence shows that on November 30, 1989, it was determined by a physician at the TA Medical Services Department that plaintiff could "remain at bench job. No bending or crouching until re-evaluated" (Malloy Decl. Ex. C at P131–32, P124B). In February 1990, the TA deemed plaintiff's continuing medical restrictions "permanent" (Greenberg Decl. ¶ 17; Malloy Decl. Ex. C at P131–32). When combined with the text of the letter sent to plaintiff on July 25, 1994, stating that "[t]he Transit Authority's records indicate that you have been unable to perform the duties of your title due to a disability resulting from a service connected (injury/illness) since 9/10/87," the evidence supports a *prima facie* claim by plaintiff that the TA regarded him as disabled within the meaning of the ADA.

Defendant argues that summary judgment should be issued in its favor because plaintiff was not actually disabled or regarded as disabled within the meaning of the ADA, and any adverse employment action against him was therefore not protected by the ADA. (Def. Mem. of Law in Support 13–18.) In support of its argument, defendant contends that plaintiff's alleged limitation in the major life activity of working and walking in 1994 cannot be deemed "substantial" within the meaning of the ADA because the limitation did not last more than about seven months (*id.* 14). This argument is not persuasive since defendant terminated plaintiff on the ground that he was cumulatively absent from his job for over a year. At the very least, defendant must acknowledge the fact that the extent of plaintiff's limitation in the major life activity of working spanned for more than one year during the period between 1988 and 1994, since it terminated him because of absence resulting from that limitation.

Defendant contends that plaintiff's 1990 working restrictions and reclassification do not form a basis for a finding that plaintiff was disabled in 1994 within the meaning of the ADA (*id.* 15–18). In support of this contention, defendant argues that its doctors' 1990 restrictions predate the ADA, and that there is no controlling law that would hold that an employer can be accused of deeming someone disabled under the ADA at a time before the ADA came into effect. Defendant also argues that there is no evidence that the 1990 restrictions were felt to still be appropriate by any TA doctor at the time of plaintiff's termination in 1994. Since plaintiff was terminated in 1994 based in part on absences that occurred in 1988–89, plaintiff's claim based on his termination in 1994 clearly relates back to events between 1988 and 1990, and the TA doctors' reports are relevant to a determination of whether defendant regarded plaintiff as disabled at the time of his termination in 1994. Furthermore, defendant cites not a single precedent that would suggest such evidence should be barred.

In addition, defendant argues that under *EEOC v. J.B. Hunt Transport,* 321 F.3d 69 (2d Cir.2003), an employer's views about employability are not imputed to other employers. Defendant also contends that even if there were evidence showing that the TA's working restrictions showed that plaintiff would be unable to work as a bus mechanic for other employers, there is still no evidence that such limitation on working would be "substantial" within the meaning of the ADA because there are many other jobs in the TA, and many other jobs in the region. (Def. Mem. of Law in Support 15–18; Def. Reply in Support 8–13). Defendant argues that plaintiff cannot seriously claim that he was substantially limited in working in 1994 within meaning of the ADA since he worked in the TPPA job and subsequently held a sales job at Home Depot (Def.

Reply in Support 10). Defendant further argues that plaintiff does not meet the Supreme Court's test in *Sutton v. United Air Lines*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), to survive summary judgment on a claim that depends on substantial limitation in working because "[i]f jobs utilizing an individual's skills (but perhaps not his unique talents) are available, one is not precluded from a substantial class of jobs," and "[s]imilarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs." *Id.* at 491–92, 119 S.Ct. 2139.

Defendant's argument that plaintiff fails to meet the *Sutton* test is unpersuasive. In determining whether plaintiff was substantially limited in the major life activity of working, *Sutton* relied on the EEOC regulations, which state that the standard is whether the employee is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(I) (cited in *Sutton*, 527 U.S. at 491, 119 S.Ct. 2139); *see also J.B. Hunt*, 321 F.3d at 75 (applying EEOC standard and affirming grant of summary judgment to defendant because evidence was not sufficient to support reasonable inference that employer regarded rejected applicants as substantially limited in a broad range or class of jobs); *Giordano*, 274 F.3d at 747–48 (applying EEOC standard and affirming grant of summary judgment to defendants on ground that plaintiff failed to meet his burden of proof to show that defendants perceived him as unable to work in a "broad class of jobs").

A review of post-*Sutton* precedents in this circuit reveals that some courts have granted summary judgment to defendants in ADA claims on the ground that an employee was not regarded as being precluded from a sufficiently broad range of jobs, *see, e.g., Burton v. Metro Transp. Auth.*, 244 F.Supp.2d 252, 259 (S.D.N.Y. 2003) (bus operator who was medically restricted from driving a TA bus, and fired, was not regarded as disabled where "[h]e is not foreclosed from a broad class of positions, and he has presented no evidence that the defendants regarded him to be"), and other courts have found summary judgment to be inappropriate where the evidence was insufficient to prove that plaintiff "has not been precluded from a broad class of jobs," *Stewart v. New York City Transit Authority*, No. 99–1601, 2001 WL 279772 (E.D.N.Y. Feb.16, 2001); *see also Simms v. City of New York*, 160 F.Supp.2d 398 (E.D.N.Y.2001) ("As Plaintiff is precluded from more than one type of job within the [Fire] Department, the Court finds that Defendants regard Plaintiff as being substantially limited in his ability to work."). In the instant case, the evidence presented by defendant is insufficient to refute a determination that plaintiff was regarded as being precluded from a broad class of jobs. The simple fact that, following plaintiff's knee injury, plaintiff was restricted from working in any job that involved bending, crouching, crawling or kneeling and was reclassified to the position of TPAA reveals that he was regarded by defendant as being precluded from a broad class of jobs.

The evidence might eventually show otherwise, but there is presently nothing in the record showing that other jobs using similar skills and training were available to plaintiff at the time he was terminated. Defendant presents evidence that "[t]here are 47,000 jobs at the TA, and nothing suggests the [plaintiff] was medically restricted from any of the many thousands of, for instance, token booth/clerk/station agent, bus driver, subway motorman, or office/administrative jobs at the Transit Authority" (Def. Mem. of Law in Support 16). Since one of plaintiff's arguments is precisely that the TA failed to offer him

one of these alternative TA jobs, this argument only supports plaintiff's claim. The fact that defendant argues that, following his termination, plaintiff worked in retail sales at Home Depot (Def. Mem. of Law in Support 17) does nothing to refute the fact that defendant may have regarded him as being "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(I). Defendant even goes so far as to argue that "there is no evidence [plaintiff] would even be precluded from working as a bus (or truck or automobile) mechanic for other employees in this geographic area ... as crawling under buses (required of a Transit Authority Bus Maintainer B) may not be required for mechanics working for other employers, and even if he were medically precluded from all 29,000 mechanics jobs [in the area], being precluded from 3/5 of 1% of the jobs in the New York City area does not show a substantial limitation in the major life activity of work" (Def. Mem. of Law in Support 17). Defendant also points to the fact that the TA is only one employer in a region in which there are over 5 million jobs (Def. Mem. of Law in Support 16–17). The mere suggestion that other mechanics jobs might not require crawling even though the TA requires of its mechanics that they be able to crawl, without any further proof that such opportunities for mechanics exist, is unconvincing. Moreover, the potential employment opportunities vaguely identified by defendant are not ones that would be filled by an average person having "comparable training, skills and abilities" as a mechanic. Defendant's attempt to show that it did not regard the plaintiff as suffering from a substantial limitation in his ability to work fails. Accordingly, plaintiff successfully establishes that he was disabled within meaning of the ADA.

All four prongs having been satisfied, plaintiff has met its burden of making a *prima facie* case of discrimination. Defendant's argument that plaintiff was not disabled within the meaning of the ADA must be rejected. Accordingly, defendant has failed to counter plaintiff's *prima facie* case that he was regarded as disabled.

### (3)

Since plaintiff makes a *prima facie* case of employment discrimination, the burden now shifts to the defendant to articulate evidence that the adverse employment action was taken for a legitimate, non-discriminatory reason. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant successfully does so, the burden of proof then shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

Defendant argues that the evidence shows the TA had a legitimate reason for its termination of the plaintiff—a reason that it argues plaintiff cannot show is a pretext for ADA-prohibited discrimination (Def. Mem. of Law in Support 11–12). Specifically, defendant argues that plaintiff was terminated pursuant to an administrative termination policy based on cumulative absences relating to one injury that was uniformly and automatically applied in mid 1994, and there is no evidence suggesting that the application of this policy to plaintiff in 1994, following an absence of several weeks as a result of an injury that had kept him from work for about 13 months in 1988–1989, was a pretext for an actual motive to discriminate against employees with disability within

meaning of the Act (*id.*).[14] Defendant explains that "[t]he Transit Authority's termination policy, as uniformly and automatically implemented in mid–1994, called for the termination of employees whose cumulative absences from one on-the-job injury (or recurrence) exceeded 260 working days, even if the most recent absence had amounted to only a few weeks (and the prior absence had occurred five years earlier)." (Def. Mem. of Law in Support 12). Defendant further argues that this policy was based on an interpretation of Civil Service Law § 71. (*Id.* at 10).

In support of its contention that the TA did not regard plaintiff as disabled when making the decision to terminate, defendant states that Jill Johnsen, the Assistant Director of Workers' Compensation at the TA who directed plaintiff's supervisor Michael Thompson to terminate plaintiff, testified that at the time of the termination decision she would not have known about the fact that plaintiff's doctor had been requesting authorizations for surgery for his knee because such requests were handled by the TA's claims examiners. (Def. Reply 8; Def. Counter Local Rule 56.1 Statement ¶ 14; Johnsen Decl. Ex. B, at 87–88). Johnsen further testified that she was not aware at the time of the deposition or at the time of plaintiff's termination that the TA contested his workers' compensation claim of July 11, 1994 on the grounds that it was not a recurrence of the prior injury. Johnsen testified that she was unaware of the TA's decision to contest the workers' compensation claim as that decision would have been made by the unit manager, who did not generally discuss such decisions with Johnsen. (Def. Counter Local Rule 56.1 Statement ¶ 14; Johnsen Decl. Ex. B, at 97–98).

■ Plaintiff argues that because the WCB has already determined that the TA had no valid reason for discharging plaintiff, defendant is collaterally estopped, under New York law,[15] from asserting that it

14. In support of its argument, defendant cites *Scott v. Memorial Sloan–Kettering Cancer Center*, 190 F.Supp.2d 590 (S.D.N.Y.2002) (summarized by defendant as "summary judgment dismissing ADA termination claim granted; termination, pursuant to an administrative policy calling for termination at expiration of 26 weeks of leave within a 52–week period, is nondiscriminatory as there is no evidence that policy was not applied uniformly" (Def. Mem. of Law in Support 11)), and *Shafnisky v. Bell Atlantic, Inc.*, No. 01–3044, 2002 WL 31513551, *6, 2002 U.S. Dist. LEXIS 21829, *17–18 (E.D.Pa. Nov. 6, 2002) ("The stated reason for plaintiff's termination is the application of defendant's medical leave policy under which any employee who is absent on disability [leave] for one year and still unable to perform any occupation with the company will be administratively terminated. In the absence of evidence that it has been applied in an inconsistent or discriminatory manner, the application of such a medical leave policy to terminate an employee after an extended absence from work is a legitimate reason for the employment action."). Both cases are easily distinguishable (Pl. Reply in Support 8)—in *Scott* the facts were substantially different, as evidenced by the fact that the court's decision to grant summary judgment to defendant was based primarily on the conclusions that plaintiff was not a "qualified individual" under the ADA, and that she failed to set forth a *prima facie* case "because she failed to present any evidence that there was an accommodation that would enable her to perform the essential functions of her position" (*Scott*, 190 F.Supp.2d at 598); in *Shafnisky*, the plaintiff was unable to perform any occupation with the company, whereas in the instant case plaintiff was capable of performing the duties of his job with reasonable accommodation.

15. Plaintiff argues that New York law governing collateral estoppel applies, because "federal courts must give the [state] agency's fact-finding the same preclusive effect to which it would be entitled in the State's courts." (Pl. Mem. of Law in Support 16) (quoting *Kosakow v. New Rochelle Radiology*, 274 F.3d 706, 730 n. 7 (2d Cir.2001) (quoting *Univ of Tenn. v. Elliott*, 478 U.S. 788, 799, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986))).

had a valid reason to discharge plaintiff in 1994 (Pl. Mem. of Law in Opp. 16–17; Pl. Mem. of Law in Support 16–17). As stated earlier, the WCB found that the TA discriminated against plaintiff and stated that the TA "did not have a valid reason for terminating [plaintiff] on August 22, 1994" (Malloy Decl. Ex. W (May 17, 2001 Decision) at 3). The WCB rejected as a pretext the TA's assertion that it discharged plaintiff pursuant to Civil Service Law § 71 (*id.*). More specifically, the WCB based its decision on the following factors:

> (1) claimant was not terminated in 1989 after 59 weeks of absences, (2) claimant was not absent from work again until 1994 when he sustained an injury to his right knee, and (3) claimant was terminated within one month of the indexing of a new workers' compensation case for his 1994 injury. The fact that claimant's 1994 workers' compensation claim was

disputed by the employer is further support for the finding of discrimination, because at the time claimant was discharged, there was an outstanding question of whether the 1994 injury was causally related to the 1987 injury.

(Malloy Decl. Ex. W (May 17, 2001 Decision) at 3). Plaintiff argues that "[b]ecause the WCB's finding that the TA had no valid reason to discharge Plaintiff was necessary to its finding of discrimination, and because the TA had a full and fair opportunity to litigate the issue during over seven years of litigation before the WCB, the TA is precluded from asserting that it had any legitimate, nondiscriminatory reason to discharge Plaintiff." (Pl. Mem. of Law in Support 17.)

█ Though defendants failed to point out the major deficiency in plaintiff's collateral estoppel argument, it is well established that state administrative proceedings not reviewed by state court do not have preclusive effect on an ADA claim.[16]

16. In opposition to plaintiff's collateral estoppel argument, defendant cites *Bland v. New York,* 263 F.Supp.2d 526 (E.D.N.Y.2003) (Korman, C.J.), a case in which the court denied plaintiff's collateral estoppel-based cross-motion for summary judgment in her favor on her Title VII (and supplemental) claims of hostile work environment based on sex discrimination. Notwithstanding a decision of the New York State Commission on Judicial Conduct that the defendant made remarks to the plaintiff that were " 'inappropriate and demeaning' and merited 'severe sanction,' " collateral estoppel did not apply to prevent the defendant from defending himself in court, and before a jury, against statutory sex-discrimination claims because, among other reasons, "an essential element of the hostile work environment claim was not 'necessarily decided' by the Commission." *Id.* at 556–57.

*Bland* is readily distinguished from the instant case since the *Bland* court gave three reasons that collateral estoppel did not have preclusive effect, all of which do not apply in this case. First, the court held that collateral estoppel did not have preclusive effect because "[t]he lack of any ability to present the new evidence in any manner other than by

cross-examination by the prosecuting counsel, the lack of right to appeal in any form of the Commission's decision to disregard such evidence, as well as the fact that [defendant employer] did not seek the administrative forum, raise serious questions as to whether [defendant] had a full and fair opportunity to litigate the factual questions that could support his civil liability in the present case." *Id.* at 556. Second, the court in *Bland* found that collateral estoppel did not have preclusive effect because "in the context of determining whether findings from a professional disciplinary hearing could preclude issues in a later civil action, the New York courts have carefully examined the nature of the procedural protections available to the defendant in the administrative proceeding, the availability and similarity of the procedures in the two proceedings, and the identity of legal and factual issues in the administrative and legal proceedings," *id.* at 552, and held that given these considerations it is doubtful whether the "Commission's findings would be given preclusive effect in New York," *id.* at 556. Third, the court held that "[e]ven if the Commission's factual findings were entitled to preclusive effect here, the Commission's findings would not necessarily entitle plaintiff to judg-

The analysis begins with *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982), which held that "[s]ince it is settled that decisions by the EEOC do not preclude a trial *de novo* in federal court, it is clear that unreviewed administrative determinations by state agencies also should not preclude such review even if such a decision were to be afforded preclusive effect in a State's own courts." *Id.* at 470 n. 7, 102 S.Ct. 1883. The logic in *Kremer* was followed in *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), which explained that "[u]nder 42 U.S.C. § 2000e–5(b), the Equal Employment Opportunity Commission (EEOC), in investigating discrimination charges, must give 'substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local [employment discrimination] law.' ... [I]t would make little sense for Congress to write such a provision if state agency findings were entitled to preclusive effect in Title VII actions in federal court." *Id.* at 795, 106 S.Ct. 3220. Thus, the Second Circuit has held that where it is clear that Congress did not intend the decisions of states agencies to have preclusive effect in a case brought under federal law, such as in Title VII cases, "unreviewed decisions of state administrative agencies will not bar a subsequent *de novo* trial." [17] *Kosakow*, 274 F.3d at 728 (citing *Elliott*, 478 U.S. at 795–96, 106 S.Ct. 3220).

Though the Supreme Court has not dealt with the preclusive effect of collateral estoppel in an ADA case, it has extended the rule in *Elliott* to ADEA cases. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 110–112, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). The Second Circuit has extended this logic to ADA cases in dicta. In *Kosakow v. New Rochelle Radiology*, a case involving a former employee who alleged that her former employer eliminated her position while she was on medical leave in violation of the Family and Medical Leave Act (FMLA), and failed to pay her severance benefits in violation of the Employee Retirement Income Security Act (ERISA), the Second Circuit held that plaintiff was not precluded under the doctrine of collateral estoppel from litigating her FMLA claim after she had already presented her case to the New York State Division of Human Rights. Though it did not deal with an ADA claim in that case, the Second Circuit observed that "to the extent [plaintiff's] employment discrimination claims were based on the ADA, the determinations of the [New York State Division of Human Rights] would have had no effect on subsequent federal litigation." *Kosakow*, 274 F.3d at 735. The First and Ninth Circuits have actually extended the logic in *Kremer* and *Elliott* to ADA claims. *Thomas v. Contoocook Valley Sch. Dist.*, 150 F.3d 31, 40 (1st Cir. 1998) (cited in *Kosakow*, 274 F.3d at 735) ("[J]udicially unreviewed state agency determinations are not entitled to preclusive effect in actions brought pursuant to [the ADA]."); *Medeiros v. City of San Jose*, No. 98–16530, 1999 WL 613405, at *1, 1999 U.S.App. LEXIS 18810, at *4 (9th Cir. Aug. 12, 1999) ("Unreviewed state agency

---

ment here because they do not necessarily 'prove or disprove, without more, an essential element of any of the claims set forth in the complaint.' " *Id.* (citation omitted). These factors do not apply to Greenberg's hearing before the WCB.

**17.** Where federal law does not expressly limit the weight given to the determinations of state administrative agencies, such as in § 1983 actions, "the factual determinations of a state administrative agency, acting in a judicial capacity, are entitled to the same issue and claim preclusive effect in federal court that the agency's determination would receive in the State's courts." *Kosakow*, 274 F.3d at 728 (citing *Elliott*, 478 U.S. at 798–99, 106 S.Ct. 3220).

findings are not afforded preclusive effect in ADA actions."). *See also Jones v. New York City Hous. Auth.,* No. 94–3364, 1995 WL 736916, at *2, 1995 U.S. Dist. LEXIS 18374, at *5 (S.D.N.Y. Dec. 13, 1995) (cited in *Kosakow,* 274 F.3d at 735) ("[P]laintiff who sues in federal court under the employment provisions of the ADA is not precluded from relitigating findings of a state administrative agency that have not been judicially reviewed.").

As noted earlier in the Background section, following multiple WCB decisions, the TA filed three notices of appeal with the New York State Supreme Court Appellate Division, Third Department, but failed to prosecute all three (Malloy Decl. ¶ 4). All three of those appeals were deemed abandoned. On September 11, 2002, the Third Department dismissed the TA's third · abandoned appeal. (Malloy Decl. ¶ 4 and Ex. W (3rd Dep't Sept. 11, 2002 Decision and Order on Motion)). Accordingly, none of the WCB decisions have been judicially reviewed. Therefore, in this case, the findings of the WCB do not have preclusive effect in this ADA action. Nonetheless, though not required, it may be appropriate in this instance to accord "substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local [employment discrimination] law," as the EEOC is required to do under 42 U.S.C. § 2000e-5(b) when investigating discrimination charges.

█ In opposing plaintiff's collateral estoppel argument, defendant raises several arguments against the relevance of the WCB's findings to the instant discrimination action, which may be germane in determining the weight that those findings should be given. (Def. Mem. of Law in Support 12 n. 5; Def. Opp. 15–19; Def. Reply in Support 4–5). First, defendant argues that the Board's use of the term "pretext" is not the same use of the term

as used to interpret the parties' burdens in ADA or NYSHRL or NYCHRL cases— the Board referred to use of § 71 as a "pretext" for retaliation prohibited under § 120 of the Workers' Compensation Law. (*Id.* at 15.) Second, defendant argues that the Board was not entertaining an ADA claim and never concluded that the TA's motive in terminating plaintiff was because he was disabled (or perceived as such) within meaning of the ADA or NYSHRL or NYCHRL. Third, defendant contends that the fact that a state court or administrative body may conclude that a party has violated state law, or state-law standards, does not prevent that party from fully defending itself in a lawsuit based on a federal (or other) claim where the state court or body did not decide liability under federal law (or comparable state or local law). Nevertheless, the fact stands that the WCB found that the TA discriminated against plaintiff and stated that the TA "did not have a valid reason for terminating [plaintiff] on August 22, 1994" (Malloy Decl. Ex. W (May 17, 2001 Decision) at 3). The WCB's finding is persuasive.

Thus, in light of the evidence presented by the parties, including the factual findings of the WCB which are accorded substantial weight, defendant fails to meet its burden of showing that the adverse employment action was taken for a legitimate, non-discriminatory reason. Furthermore, plaintiff's cross-motion for summary judgment as to the claim that defendant had no valid reason to terminate plaintiff's employment is granted.

### (4)

Since defendant fails to meet its burden under the *McDonnell Douglas* framework, the burden now shifts to the plaintiff to prove that the employer's proferred reason was in fact a pretext for discriminatory action within meaning of the ADA. Though the Supreme Court has held that "a plain-

tiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," the Court has also acknowledged that it is not the case that "a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In this vein, the Court stated that "the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff. The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct.' In other words, 'it is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.'" *Id.* at 147, 120 S.Ct. 2097 (citations omitted).

■ In this instance, the fact that defendant fails to prove that its adverse employment action was taken for a legitimate, non-discriminatory purpose is not suffi-

cient to affirmatively prove that defendant actually discriminated in violation of the ADA. In order to prove that defendant intentionally discriminated, plaintiff relies on defendant's letter of termination to plaintiff in which defendant states that plaintiff was being terminated because he had been "unable to perform the duties of [his] title due to a disability resulting from a service connected (injury/illness) since 9/10/87" (Pl. Mem. of Law in Support 14; Malloy Decl. Ex. J.) [18] While this letter is sufficient to support plaintiff's *prima facie* case, it is by no means certain that a reasonable jury would find that defendant actually violated the ADA since it is not clear that the "disability" referred to in the letter is actually a "disability" within meaning of the ADA. Therefore, whether or not defendant actually terminated plaintiff for a discriminatory reason is an outstanding question of material fact that should be determined by a jury.

In sum, defendant failed to prove that plaintiff was not disabled within the meaning of the ADA, and also failed to prove that the evidence shows that the TA had a legitimate, nondiscriminatory reason for its termination of the plaintiff. Accordingly, defendant's motion for summary judgment on plaintiff's ADA discrimination claim with respect to his termination must be denied. At the same time, plaintiff failed to prove that defendant actually discriminated against him within meaning of

---

**18.** Plaintiff also puts forth two additional arguments in opposition to defendant's attempts to show that the adverse employment action was taken for a legitimate, non-discriminatory reason, and in support of its claim that defendant discriminated. First, plaintiff argues that defendant's varying explanations for plaintiff's discharge provide additional evidence of discrimination (Pl. Mem. of Law in Opp. 18). In addition, plaintiff contends that it is entitled to an adverse inference as a result of TA's alleged destruction of and failure to retain relevant evidence, namely rec-

ords relating to plaintiff's termination (Pl. Mem. of Law in Opp. 22–23). Neither argument is sufficiently persuasive to lead to a finding that defendant intentionally discriminated in violation of the ADA. Moreover, plaintiff's attempt to prove that documents were destroyed is unconvincing. Even if documents were destroyed, plaintiff fails to show that they were destroyed in any manner other than in the ordinary course and there is no proof that the allegedly destroyed documents would support plaintiff's claims.

the ADA in its decision to terminate his employment, and the question of whether defendant discriminated should be left to a jury. Therefore, plaintiff's cross-motion for summary judgment in his favor on the ADA discrimination claim must be denied.

### (5)

Defendant argues that summary judgment should be granted in its favor on plaintiff's claim that his reinstatement to a TA job was unlawfully delayed either based on his disability or in retaliation for filing an EEOC claim in September 1994 (Def. Mem. of Law in Support 18; Def. Reply 13–14).

Plaintiff argues that based on plaintiff's two-year delay in reinstating him, "a reasonable jury could conclude not only that the TA refused to reinstate Plaintiff because of his disability, but that it also did so to retaliate against him for contesting the TA's unlawfully discharging him." (Pl. Mem. of Law in Opp. 21). To establish a *prima facie* case of retaliation under the ADA a plaintiff must show that: (1) the employee was engaged in an activity protected by the ADA; (2) the employer was aware of that activity; (3) an employment action adverse to the plaintiff occurred; and (4) there existed a casual connection between the protected activity and the adverse employment action. See *Muller v. Costello,* 187 F.3d 298, 311 (2d Cir.1999).

Plaintiff argues that his retaliation claim is bolstered by the events following his filing of a charge of discrimination with the EEOC on September 13, 1994. On September 28, 1994, the TA sent a letter to plaintiff stating that he would not be reinstated until his medical condition improved. On October 5, 1994, the TA refused to reinstate plaintiff through the grievance process. (Pl. Mem. of Law in Opp. 21.) On March 10, 1995, following a determination on March 2 by City-appointed physician Dr. Pearlman that plaintiff could return to his "usual occupation with no restrictions" (Malloy Decl. Ex. O), the Department of Personnel issued a certificate to the TA authorizing plaintiff's reinstatement to his former position, effective May 15, 1995 (Malloy Decl. Ex. T). On May 26, 1995, however, the TA Assistant Vice President of Employment wrote to the Department of Personnel stating that there were no current vacancies in the TPPA title and requested that plaintiff's name be placed on a preferred list for future vacancies (Malloy Decl Ex. U). Plaintiff was reinstated to the position of TPPA on June 9, 1997 (Greenberg Decl. ¶ 60.)

Defendant argues that from March 1995 until June 1997, there were no vacancies for TPPA jobs (Def. Mem. of Law in Support 18). Plaintiff argues that based on the record, plaintiff could have been reinstated in the position of station agent (then referred to as Railroad Clerk), since TPPA and station agent are similar positions and TPPAs are eligible for transfer to the position of station agent (Pl. Mem. of Law in Opp. 21; Pl. Rule 56.1 Statement ¶ 79). Defendants acknowledges that there were vacancies in the position of Railroad Clerk, but states that Railroad Clerk is not a title to which plaintiff was eligible to be reinstated (Def. Counter Local Rule 56.1 Statement ¶ 38). Plaintiff further argues that the TA transferred 21 TPPAs to the position of station agent/Railroad Clerk in 1995 (Pl. Mem. of Law in Opp. 21).

Thus, plaintiff claims that the failure to reinstate plaintiff as a station agent/Railroad Clerk between 1995 and 1997 was discriminatory, either based on disability or on intent to retaliate. (Pl. Mem. of Law in Opp. 22.) Plaintiff has successfully established that prongs (1) and (3) of the test for a *prima facie* case of retaliation, namely that he was engaged in an ADA-protected activity when he filed an EEOC action in 1994, and that an adverse employment

action occurred in that he was not reinstated.

However, plaintiff has not shown that anyone in the TA who was involved in the delay in reinstating him was aware that he had filed an EEOC action. Furthermore, plaintiff has not shown a causal connection between the protected activity and the adverse employment action. Plaintiff argues that a causal connection can be established by "a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions." (Pl. Mem. of Law in Opp. 21) (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002)). Plaintiff's argument is unconvincing because defendant's delay in reinstating plaintiff commenced with actions in July and August 1994, as defendant did not facilitate plaintiff's attempts to avoid being terminated when he attempted to return to work and when he sought to establish that he was medically qualified to work as a TPPA. Defendant's delay in reinstating plaintiff appears to have been a continuation of a pattern that began prior to September 1994, by which defendant decided to terminate plaintiff and showed no interest in preventing the termination from going forward or in assisting plaintiff with his efforts at reinstatement. Since plaintiff only filed his EEOC action in September 1994, after defendant had already commenced a pattern of decision-making to obstruct plaintiff's efforts at reinstatement, the fact that defendant continued to delay plaintiff's reinstatement is hardly evidence that defendant's delay in reinstating plaintiff was causally connected to his filing an EEOC action. Therefore, plaintiff fails to make a *prima facie* case of retaliation, and defendant's motion for summary judgment on this ground should be granted.

Next, it is necessary to consider plaintiff's claim that defendant's delay in rein-

stating him constituted discrimination in violation of the ADA. Plaintiff argues that the TA's policy regarding reinstatement discriminated against him based on disability (Pl. Mem. of Law in Opp. 18–19). Plaintiff's argument is based on the fact that defendant stated plaintiff was not entitled to reinstatement to any position at the TA until he was "medically cleared" (*id.*). Upon being questioned at a deposition, Dennis Monsen stated that for a medical disability to be considered terminated it must be "100 percent healed" and the employee must be able to return to "full work" since "[t]here is no restricted duty in [plaintiff's division] or there wasn't at the time." (Malloy Decl. (Monsen dep.) Ex. E at 68–69). In response to a similar question, Jill Johnsen stated that in order to be reinstated the employee's "doctor has to say that they are no longer disabled and can return back to work," though she stated that she did not know "if a person would be reinstated if they could only return to work with certain restrictions." (Malloy Decl.(Johnsen dep.) Ex. D at 50). Plaintiff interprets these statements to mean that "[a]ccording to the TA, [p]laintiff was not entitled to be reinstated until he was "100% healed," able to perform "full work" and "no longer disabled." (Pl. Rule 56.1 Statement ¶ 47). Defendant attempts to argue that Monsen and Johnsen's statements on the TA's reinstatement policy are immaterial, since neither Monsen nor Johnsen were the decision makers implementing the TA's reinstatement policy. (Def. Counter Local Rule 56.1 Statement ¶ 27). Defendant makes a convincing point as to Johnsen, who stated that she "had no role in Mr. Greenberg's reinstatement to employment with the Transit Authority, and [ ] communicated with no one with respect to such reinstatement" (Johnsen Decl. ¶ 5). However, defendant points to no similar statement by Monsen, and given Monsen's former posi-

tion as Director of Labor Relations for the Transit Police Special Services Bureau, it is fair to conclude that his statement reflects TA policy on when plaintiff could be reinstated. As a result of the TA's policy, plaintiff was medically disqualified from returning to any work at the TA until March 17, 1995, a period of eight months.

■ As detailed in the discussion of plaintiff's unlawful termination claim in section (4), plaintiff does make a *prima facie* case that defendant discriminated against him as to the first three prongs of the test for a *prima facie* case of discrimination. With respect to the reinstatement claim, the one prong that is distinct from the previous analysis is the fourth, requiring that plaintiff show that "he suffered adverse employment action because of his disability." *See Giordano*, 274 F.3d at 747. Certainly, a delay in reinstating an employee constitutes an adverse employment action for these purposes. *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999) ("Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."). With respect to this claim, plaintiff needs to show that defendant delayed his reinstatement because of his disability. Based on the evidence described above, particularly the deposition testimony of Dennis Monsen and Jill Johnsen, plaintiff makes a *prima facie* case that the TA delayed plaintiff's reinstatement because of disability by applying a policy under which plaintiff was not entitled to be reinstated until he was "100% healed," able to perform "full work" and "no longer disabled."

■ Since plaintiff states a *prima facie* case, under the *McDonnell Douglas* burden-shifting framework, the burden falls on defendant to establish that its delay in reinstating plaintiff was taken for a legitimate, non-discriminatory reason. Defendant argues that its delay in reinstating plaintiff was based on an interpretation of Civil Service Law § 71 which states that an employee who has been terminated from a particular civil service title under that provision could only be reinstated to vacancies in that particular title, or if there were none in that particular title, to a lower title in the same occupational category (Def. Mem. of Law in Support 20.) Defendant states that no jobs in the same title (TPPA) or in a lower title (Cleaner) were available until a TPPA position became available in June 1997, at which time plaintiff was reinstated (Def. Mem. of Law in Support 20.) Plaintiff contradicts the TA's statement that there were no vacancies in the Cleaner position from 1994 to 1997 (Pl. Mem. of Law in Opp. 20), and this question of fact raised by plaintiff is not countered by defendant. Accordingly, this is an outstanding question of material fact. Moreover, as plaintiff correctly points out, Civil Service Law § 71 provides that a former employee in plaintiff's position "shall be reinstated to his former position, if vacant, or to a vacancy in a similar position or a position in a lower grade in the same occupational field, or to a vacancy for which he is eligible for transfer." (Pl. Mem. of Law in Opp. 21). Plaintiff presents evidence suggesting that in 1995, the TA transferred 21 TPPAs to the position of station agent. (Pl. Mem. of Law in Opp. 21). Defendant does not counter this assertion, thereby leaving open another question of material fact. Because defendant's stated non-discriminatory reasons for delaying plaintiff's reinstatement cannot be accepted without further findings of fact, defendant fails to satisfy its burden of showing that it delayed plaintiff's reinstatement for a legitimate, nondiscriminatory reason. Thus, defendant's motion to dismiss this discrimination claim as to plaintiff's delayed reinstatement should be denied.

**(6)**

■ Plaintiff argues that even if summary judgment cannot be granted in his favor under the ADA, summary judgment should be granted in his favor on the claims that the TA discriminated against plaintiff in violation of NYSHRL and NYCHRL. Claims brought under NYSHRL and NYCHRL are generally subject to the same analysis as ADA claims. *See Collins v. Christopher,* 48 F.Supp.2d 397, 411 (S.D.N.Y.1999). Nonetheless, there are a few differences between the ADA and the state and city codes. First, the definition of "disability" is broader under the NYSHRL and the NYCHRL than under the ADA. *See Reeves,* 140 F.3d at 147. Under the NYSHRL, a disability is defined in part as: "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." N.Y. Exec. Law § 292(21). That is, under the state law, a disability only needs to be a demonstrable impairment; it does not have to substantially limit a major life activity. *See Reeves,* 140 F.3d at 154. The NYCHRL's definition of disability is even broader, requiring only that it be: "any physical, medical, mental or psychological impairment, or a history or record of such impairment." N.Y. City Admin. Code § 8–102(16)(a). Thus, unlike the ADA, neither the NYSHRL nor the NYCHRL requires a plaintiff to show that his disability "substantially limits a major life activity." *See Giordano,* 274 F.3d at 754 (citing *Hazeldine v. Beverage Media, Ltd.,* 954 F.Supp. 697, 706 (S.D.N.Y.1997) (observing that a person can be disabled within the meanings of New York's state and municipal laws even if his or her impairment does not substantially limit a major life activity), and *Reeves,* 140 F.3d at 155).

While claims under the state and city codes are brought under a broader definition of "disability," they are still examined using the *McDonnell Douglas* burden-shifting framework. *See Reeves v. Johnson Controls World Servs.,* 140 F.3d 144, 156 n. 9 (2d Cir.1998) (NYSHRL) (citing *North Shore Univ. Hosp. v. Rosa,* 86 N.Y.2d 413, 633 N.Y.S.2d 462, 464, 657 N.E.2d 483 (1995)); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2000) (NYCHRL) (citing *Landwehr v. Grey Advert., Inc.,* 211 A.D.2d 583, 622 N.Y.S.2d 17, 18 (1st Dep't 1995)). Given the broader definition of disability under the state and city disability discrimination laws, and the fact that plaintiff has established a *prima facie* case under the narrower definition of the ADA, it follows that plaintiff has established a *prima facie* case under the NYSHRL and the NYCHRL. Moreover, the record clearly shows that plaintiff had a "a physical ... impairment resulting from anatomical [or] physiological ... conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques," N.Y. Exec. Law § 292(21), and that plaintiff suffered from a "physical ... impairment" and had "a history or record of such impairment," N.Y. City Admin. Code § 8–102(16)(a). As under the ADA analysis, "the burden of proof shifts to the employer to demonstrate that the disability prevented the employee from performing the duties of the job in a reasonable manner or that the employee's termination was motivated by a legitimate nondiscriminatory reason." *Matter of McEniry v. Landi,* 84 N.Y.2d 554, 558, 620 N.Y.S.2d 328, 644 N.E.2d 1019 (1994) (citing *Matter of Miller v. Ravitch,* 60 N.Y.2d 527, 532, 470 N.Y.S.2d 558, 458 N.E.2d 1235 (1983)).

■ Though the findings of the WCB already summarized in section (3)

did not have preclusive effect for the ADA claim, the factual findings of the WCB may have preclusive effect in New York courts under the doctrine of collateral estoppel.[19] Under New York law, in order for collateral estoppel to have preclusive effect, there must be an " 'identity of issue which has necessarily been decided in the prior action and is decisive of the present action,' and the party to be estopped must have had a 'full and fair opportunity to contest the decision now said to be controlling.' " *Kosakow,* 274 F.3d at 730 (quoting *Schwartz v. Public Adm'r,* 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 960, 246 N.E.2d 725 (1969)). In New York courts, "any party to [a] hearing [before the Workers' Compensation Board] who had the required notice and opportunity to be heard will be precluded from relitigating issues necessarily decided by the administrative Judge." *Liss v. Trans. Auto Sys., Inc.,* 68 N.Y.2d 15, 21, 505 N.Y.S.2d 831, 496 N.E.2d 851 (1986). Thus, factual findings by the WCB may have collateral estoppel effect in this action.

 The critical questions in determining whether the findings of the WCB have preclusive effect are whether there is an identity of issue, and whether the defendant had a full and fair opportunity to contest the decision. *See Schwartz,* 24 N.Y.2d at 71, 298 N.Y.S.2d at 960, 246

N.E.2d 725. "The burden of proving identity of the issue rests on the proponent of collateral estoppel, while the opponent bears the burden of proving that he or she did not have a full and fair opportunity to litigate the issue." *Kosakow,* 274 F.3d at 730 (citing *Schwartz,* 24 N.Y.2d at 73, 298 N.Y.S.2d at 962, 246 N.E.2d 725). Plaintiff successfully meets its burden of proving identity of issue by establishing that the WCB filed a charge of discrimination with the WCB for the same adverse employment action (e.g. termination) that was the basis of plaintiff's discrimination claims under NYSHRL and NYCHRL (Pl. Mem. of Law in Support 17.) Plaintiff points out that as part of its finding that defendant discriminated against plaintiff in violation of § 120 of the New York's Workers' Compensation Law, the WCB found that the TA "did not have a valid reason for terminating [plaintiff] on August 22, 1994" (*id.;* Malloy Decl., Ex.W). Thus, plaintiff successfully satisfies the burden of showing that there is an identity of issue which has necessarily been decided in the prior action and is decisive of the present action. Moreover, defendant's briefs do not even attempt to argue that defendant did not have a full and fair opportunity to litigate the issues, and focus instead on whether or not there was an identity of issues (Def.

---

19. Application of the doctrine of collateral estoppel to the disability discrimination claims raises an interesting question. In light of the WCB's decision holding that the TA terminated plaintiff with a retaliatory intent as a result of said claimant's claim for workers' compensation benefits, does collateral estoppel bar plaintiff from now claiming that the TA terminated him because of unlawful disability discrimination rather than because of unlawful retaliation for seeking workers' compensation benefits? An answer to this question can be found in a recent decision involving a teacher's claim of sex discrimination where the WCB had already held that the employer school district denied the teacher's

promotion "with a retaliatory intent as a result of said claimant's claim for workers' compensation benefits." *Macri v. Newburgh Enlarged City Sch. Dist.,* No. 01–1670, 2004 WL 1277990, at *6, 2004 U.S. Dist. LEXIS 10515, at *42 (S.D.N.Y. June 8, 2004) (Mukasey, C.J.). In that case, the district court held that the defendant school district's "decision could have been motivated both by sex discrimination and by unlawful retaliation for plaintiff's attempt to obtain workers' compensation benefits, which means that the Workers Compensation Board decision is neither decisive of nor inconsistent with plaintiff's claims." *Id.*

Mem. of Law in Support 12 n. 5; Def. Opp. 15–19; Def. Reply in Support 4–5).

Thus, defendant cannot show a legitimate, non-discriminatory reason for plaintiff's termination with respect to the supplemental New York claims. In addition, defendant has "failed to establish on this record that, as of the time of termination, petitioner was unable to perform the duties of the job because of his [disability]." *McEniry*, 84 N.Y.2d at 560, 620 N.Y.S.2d 328, 644 N.E.2d 1019 (citing *Miller*, 60 N.Y.2d at 532, 470 N.Y.S.2d 558, 458 N.E.2d 1235). Defendant having failed to meet its burden, plaintiff has proven that defendant did in fact intentionally discriminate within the definitions of the NYSHRL and NYCHRL.

To the extent any additional burden falls on plaintiff to establish that the TA actually discriminated against him, plaintiff satisfies this burden with respect to both laws by showing that TA itself informed him that he had been discharged because in its view he had been "unable to perform the duties of [his] title due to a disability resulting from a service connected (injury/illness) since 9/10/87" (Malloy Decl. Ex. J). Under the NYSHRL, an employer engages in unlawful discrimination when that employer "because of the . . . disability . . . of any individual . . . discharge[d] from employment such individual." N.Y. Exec. Law § 296.1(a). Plaintiff has shown that the TA engaged in discrimination in violation of the NYSHRL. Under the NYCHRL, an employer engages in unlawful discrimination when that employer "because of the actual or perceived . . . disability . . . of any person . . . discharge[d] from employment such person." N.Y.C. Admin. Code § 8–107(1)(a). Plaintiff has shown that the TA engaged in discrimination in violation of the NYCHRL. Thus, plaintiff satisfies the burden of showing that defendant unlawfully discriminated against him based on a disability within

the meaning of both NYSHRL and NYCHRL. Summary judgment in plaintiff's favor on these claims should be granted.

**(7)**

An additional basis upon which defendant argues that this action should be dismissed is that plaintiff testified falsely at his deposition in October 1999 (Def. Mem. of Law in Support 22–25; Def. Reply 14–15). Specifically, defendant alleges that plaintiff lied about psychological treatment he received after his discharge in 1994 because he failed to identify "psychological or emotional injury" or the fact that he had seen a psychologist when asked if there were "other injuries" or accidents he had suffered or "other doctors" he had seen. Defendant argues that under the court's "inherent power" (and Federal Rules of Civil Procedure 30(c), 37(b-d) and 41(b)), the action should be dismissed since the plaintiff misled not only the TA's lawyers but the Magistrate Judge as well (Def. Mem. of Law in Support 23). Alternatively, defendant argues that at a minimum preclusion of evidence about any psychological or emotional injury should be imposed as a sanction against plaintiff. (*Id.*)

A review of the portion of the deposition identified by defendant as containing the questions and answers forming the basis for its perjury allegation (*id.* at 22; Schoolman Decl. Ex. Q 65–67, 70, 77–104) reveals that the line of questioning was directed to physical impairment and did not focus at all on any potential claims of emotional distress. Moreover, the fact that plaintiff may be pursuing this ADA claim primarily in order to recover damages for emotional distress, as suggested by defendant (Def. Mem. of Law in Support 22), only serves to undermine defendant's argument since it would be in plaintiff's interest to support his claim by

highlighting his psychological condition rather than hiding it. Thus, defendant's contention that plaintiff lied is unfounded, and this argument for dismissal of the action is rejected.

### Conclusion

Accordingly, both defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment are denied in part and granted in part. Defendant's motion for summary judgment in its favor is denied as to the ADA discrimination claims with respect to plaintiff's termination and his delayed reinstatement. Defendant's motion for summary judgment is granted as to the ADA retaliation claim with respect to plaintiff's delayed reinstatement. Defendant's motion for dismissal of this action based on allegedly false material statements made by plaintiff is denied.

Plaintiff's cross-motion for summary judgment in his favor is granted as to the fact that defendant had no valid reason to terminate plaintiff's employment, and as to the claim that defendant discharged plaintiff from his employment because he was disabled within the meaning of the New York State Human Rights Law and the New York City Human Rights Law. Plaintiff's cross-motion for summary judgment in his favor is denied with respect to the ADA discriminatory termination claim.

SO ORDERED.